# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

|  |  |
|---|---|
| AVENTURINE ONE, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> THE CITY OF MARSHALL, TEXAS, <br><br> *Defendant*. | Case No. 2:23-cv-00451-RSP |

## STATEMENT OF INTEREST OF THE UNITED STATES

### I.   Introduction

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517[1] to assist the Court in interpreting the Fair Housing Act (FHA), 42 U.S.C. § 3601 *et seq*.

This lawsuit involves Defendant's denial of a special use permit required for Plaintiff's proposed affordable housing development in Marshall, Texas, and whether that denial violates the FHA.  In *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project*, the Supreme Court acknowledged that land use decisions that restrict the development of multifamily housing can unlawfully discriminate because of race in violation of the FHA. *See* 576 U.S. 519, 539-40 (2015) (citing, in part, *Town of Huntington v. Huntington Branch, NAACP,* 488 U.S. 15, 16-18 (1980) (per curiam) (invalidating zoning law preventing construction of multifamily rental units); *United States v. City of Black Jack*, 508 F.2d 1179, 1182-88 (8th Cir. 1974) (invalidating

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

ordinance prohibiting construction of new multifamily dwellings)). The Attorney General has enforcement authority under the FHA, *see* 42 U.S.C. §§ 3612(o), 3614, and has pursued cases challenging actions by municipalities that block the development of multifamily housing. *See, e.g., United States v. City of Arlington*, No. 4:22-cv-00030-P (N.D. Tex. Jan. 13, 2022); *United States v. Vill. of Tinley Park*, No. 16-cv-10848 (N.D. Ill. Nov. 23, 2016). The United States, therefore, has a strong interest in ensuring the proper application of the FHA in this context.

## II.     Background

In its Complaint, Plaintiff Aventurine One, LLC alleges that it sought a special use permit for a proposed Low-Income Housing Tax Credit development in Marshall, Texas.[2] Compl. ¶¶ 6, 8, 12, ECF No. 1. Plaintiff initially obtained a resolution from the City of Marshall supporting the development and finding that it "was consistent with the safety and welfare of the community. . . ." *Id*. ¶ 9. Plaintiff avers that the City's Planning and Zoning Commission ("Commission"), however, denied the permit "based on illegal and discriminatory objections" made at a public hearing by "the Commission and City residents." *Id*. ¶ 13. After recognizing it had improperly ratified constituents' discriminatory objections, the Commission reconsidered and approved the permit application and submitted its recommendation to the City Council for final approval. *See id*. ¶¶ 14-17. But, "after months of continuous pressure and fear mongering of community members and certain City officials, the City ultimately and improperly denied Aventurine's permit." *Id*. ¶ 23. Plaintiff alleges, among other things, that the City's conduct discriminated on the bases of race and national origin in violation of the FHA. *Id*., First Cause of

---

[2] As is appropriate at the motion to dismiss stage, this brief takes as true the factual allegations of Plaintiff's Complaint. The United States otherwise takes no position on the underlying facts of this case.

Action.  Defendant has moved to dismiss Plaintiff's Complaint. Def.'s Mot. to Dismiss (hereinafter "Mot."), ECF No. 6.

Defendant's Motion to Dismiss argues that Plaintiff's claim of disparate treatment under the FHA should be dismissed because: (1) the comments in opposition to the proposed development that are quoted in the Complaint do not explicitly refer to race or national origin; and (2) these statements and questions were from residents, not City officials. *See* Mot. at ¶¶ 28-30.  As explained below, these arguments lack merit.  Courts have found that comments like those alleged here can evidence a discriminatory motive even when they do not directly reference race or national origin.  And courts have also made clear that municipalities can be held liable for capitulating to the discriminatory objections of their constituents, even when elected officials do not explicitly endorse or voice such objections themselves.[3]

### III.   Argument

A. <u>Statements that do not directly reference a protected class can evidence discriminatory intent.</u>

Although Defendant concedes that disparate treatment under the FHA may be proven through circumstantial evidence, Mot. at ¶ 20, Defendant repeatedly asserts in support of its Motion that none of the allegedly discriminatory comments made at hearings on Plaintiff's proposed development explicitly reference a protected class. *Id*. at ¶¶ 24, 28-29.  The FHA, however, does not require overt references to race or national origin for claims of intentional discrimination.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into each such circumstantial and direct evidence of intent as may be

---

[3] This Statement does not address the parties' other claims or arguments.

available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Courts have acknowledged that direct evidence of discrimination is especially unlikely to be forthcoming in cases involving racial motivation of public officials. As the Fourth Circuit explained:

> Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving racial discrimination. . . .

*Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982). *See also Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) ("As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find.")

Recognizing that expression of discriminatory sentiments is often more covert, courts, including in this circuit, have found that statements that do not explicitly reference race or national origin may nevertheless be indicative of discriminatory animus. For example, in *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, the court considered whether race was implicated in an editorial concerning proposed mixed-income housing developments, which was published in St. Bernard Parish's official newspaper. *See* 641 F. Supp. 2d 563, 571-72 (E.D. La. 2009). Although the editorial did not directly mention race, the court determined that its references to "ghetto, crime, drugs, violence," and certain multifamily housing developments "juxtaposed against their 'threat' and the 'shared values' of overwhelmingly Caucasian St. Bernard Parish" were "clearly . . . an appeal to racial as well as class prejudice." *Id*. at 572. Other courts have similarly concluded that, in the context of opposition to affordable housing development, appeals to concerns about increased crime, in particular, can be discriminatorily

4

motivated. *See, e.g., Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 506-07 (9th Cir. 2016) (finding that, along with other allegations, complaints to the effect that residents would create a "low cost, high crime neighborhood" offered plausible circumstantial evidence of discriminatory animus); *Smith*, 682 F.2d at 1066 (affirming district court's interpretation of concerns about "undesirables" and "personal safety due to the influx of 'new' people" as "'camouflaged' racial expressions"); *Atkins v. Robinson*, 545 F. Supp. 852, 874 (E.D. Va. 1982), aff'd, 733 F.2d 318 (4th Cir. 1984) (noting that a county official's comments that "crime is on the rampage in housing projects" and expressing fear that they "would degenerate to slum-like conditions, with an abundance of crime" may "rest on a veiled reference to race").

Here, Plaintiff alleges that community members opposed the proposed affordable housing primarily because of "the 'type' of people that may reside in the redevelopment," not based on traditional zoning concerns regarding the use of the property. *See* Compl. ¶¶ 13, 21.  Like the comments considered in the cases mentioned above, the statements and questions referenced in the Complaint intimated that the new residents would threaten "safety and security" and engage in criminal activity, as well as likely include previously incarcerated persons or "child predators." *Id*.  One constituent asked for a "demographic report showing how [Plaintiff planned] to fill [the] building." *Id*. ¶ 13.  Another paradoxically expressed concern with locating a residential development that would presumably serve families with children a mile from a school. *Id*.  Such objections that assume the "type" of residents who will occupy a housing development will be "incompatible" with the neighborhood are very similar to the comments other courts have found as evidence of discriminatory intent. See cases cited above, *supra* at 4-5. *See also Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608-10 (2nd Cir. 2016) (upholding

district court's finding that references to maintaining the "flavor" and "character" of a city were "code words for racial animus").

Taken together, Plaintiff plausibly alleges through these statements that the public opposition to its redevelopment proposal was based on derogatory assumptions about who would occupy the building, rather than legitimate land use concerns. Courts have consistently found such statements can support an inference of a discriminatory intent, even when the comments stop short of explicitly referencing race or national origin.

B. <u>Under the FHA, municipalities can be held liable for capitulating to constituents' discriminatory motives.</u>

Defendant also suggests that, even assuming the statements made by its constituents were discriminatory, such motives cannot be imputed to the City Council if it did not expressly endorse them. *See* Mot. ¶ 28. Defendant's assertion, however, is based on a fundamental misunderstanding of the relevant legal precedent. In fact, as the case on which Defendant relies makes clear, "citizen comments can demonstrate that public officials acted with bias" where "the circumstances surrounding those statements strongly suggest that public officials . . . acted directly in response to citizen's discriminatory desires." *Jim Sowell Constr. Co. v. City of Coppell*, 61 F. Supp. 2d 542 (N.D. Tex. 1999).

Contrary to Defendant's insistence that "[t]here are no pleadings" to this effect, Mot. ¶ 28, Plaintiff alleges that capitulation to discriminatory opposition is precisely what occurred when the Commission (initially) and the City Council (ultimately) denied its application for a special use permit. *See* Compl. ¶¶ 14, 23. And it is well established that government entities can be held liable for capitulating to the discriminatory motives of their constituents, regardless of whether public officials explicitly endorse or personally agree with those motives. *See, e.g., United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1124 (2nd Cir. 1987) ("[A] governmental

body may not escape liability . . . merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens."); *Smith,* 682 F.2d at 1066-67 (affirming district court's finding that Town acted with discriminatory intent when it halted development of public housing in response to racially motivated opposition by residents); *Cmty. Hous. Tr. v. Dep.'t of Consumer & Regul. Affs.*, 257 F.Supp.2d 208, 227 (D.D.C. 2003) ("the law is quite clear that even where individual members of government are found not to be biased themselves, plaintiffs may demonstrate a violation of the [FHA] if they can show that discriminatory governmental actions are taken in response to significant community bias") (quoting *Tsombanidis v. City of W. Haven*, 129 F. Supp 2d 136, 152 (D. Conn. 2001) (internal quotation marks omitted)); *United States v. City of Birmingham*, 538 F. Supp. 819, 828 (E.D. Mich. 1982), *aff'd as modified*, 727 F.2d 560 (6th Cir. 1984) (plaintiff "need not prove that the [governing body] itself intended to discriminate[;] . . . it is sufficient to show that the decision-making body acted for the sole purpose of effectuating the desires of private citizens" with racial motivations).

In *Arlington Heights*, a case brought under the Equal Protection Clause concerning an allegedly discriminatory rezoning denial, the Supreme Court outlined a non-exhaustive list of circumstantial evidence factors that may be probative of a government entity's discriminatory intent. *See* 429 U.S. at 266-68.  As the Court explained, "[t]he specific sequence of events leading up the challenged decision [] may shed some light on the decisionmaker's purposes." *Id*. at 267.  The Fifth Circuit held these factors to be "pertinent" to determining discriminatory intent in *Overton v. City of Austin*, a Voting Rights Act case, and identified them as follows: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5)

7

legislative history. . . ." 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 266-68).

The court in *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.* considered these factors in finding that St. Bernard Parish had, in violation of the Fair Housing Act, acted with discriminatory intent in obstructing applications to re-subdivide properties for multifamily housing. *See* 648 F. Supp. 2d 805, 809-19 (E.D. La. 2009). In its discussion of "the specific sequence of events leading up to [St. Bernard Parish's] decision," the court noted that it was "troubled by the sudden and abrupt change in treatment" of the applications that followed a public hearing. *Id*. at 813. At this hearing, the court observed that "many of the public and official comments" in opposition to the applications included language that the court deemed to be "camouflaged racial expressions." *Id*. at 811.

Here, Plaintiff has alleged that the "sequence of events" indicates that the City's actions were taken because of the commentary voiced in public hearings. Specifically, the Complaint explains how Defendant initially supported its proposed development and found that it would help assuage the City's need for affordable housing. *See* Compl. ¶¶ 9, 12. After a public hearing that included allegedly discriminatory commentary, however, Plaintiff claims that there was an "abrupt change" in Defendant's treatment of Plaintiff's permit application, which the Commission then denied. *Id*. ¶¶ 13-14. Although the Commission later reconsidered and approved Plaintiff's application, the City Council ultimately declined to grant Plaintiff's special use permit. *Id*. ¶¶ 16, 23. Notably, the City Council did not comment on or ask any questions about the proposed development at its meeting, which Plaintiff alleges included further discriminatory statements from community members who opposed the project. *Id*. ¶ 21. In combination with its decision not to follow the Commission's recommendation, the City

8

Council's failure to disavow the public objections, ask further questions about the project, or express their own views suggests that members were swayed by the public's comments.[4]

## IV. Conclusion

For the reasons stated above, the United States respectfully requests that the Court dispose of Defendant's Motion in a manner consistent with the views expressed in this Statement.

Dated:  December 21, 2023

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General

DAMIEN M. DIGGS
United States Attorney

*/s/ Betty Young*
BETTY YOUNG
Assistant United States Attorney
Texas Bar # 24102498
110 N College Avenue, Suite 700
Tyler, TX 75702
Phone: (903) 510-9370
Fax: (903) 590-1436
Email: Betty.Young@usdoj.gov


*/s/ Jaclyn A. Harris*
CARRIE PAGNUCCO
Chief
TIMOTHY MORAN
Deputy Chief

---

[4] *L & F Homes & Dev., L.L.C. v. City of Gulfport*, 538 F. App'x 395 (5th Cir. 2013) (per curiam), which Defendant cites in support of its Motion, Mot. ¶¶ 26, 29, is inapposite.  In *L & F Homes*, the court of appeals affirmed a ruling on summary judgment that there was not sufficient evidence that the city had initially denied water service to a development because of the race of its prospective residents. *Id*. at 401-02.  The court found that comments relating to crime by a single police officer—and concerning an adjacent development—a year prior did not create a material issue of fact, given that other evidence regarding both developments showed that officials had acted for valid, non-discriminatory reasons. *Id*. at 401.

        JACLYN A. HARRIS
        Trial Attorney
        DC Bar # 90000692
        Housing and Civil Enforcement Section
        Civil Rights Division
        U.S. Department of Justice
        950 Pennsylvania Avenue NW – 4CON
        Washington, DC 20530
        Phone: (202) 305-5944
        Fax: (202) 514-1116
        Email: Jaclyn.Harris@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I certify that on December 21, 2023, I electronically filed this document by using CM/ECF, which automatically serves counsel of record.

        */s/ Betty Young*
        BETTY YOUNG